TEXARKANA TELEPHONE COMPANY *v.* PEMBERTON.

Opinion delivered May 18, 1908.

1. MASTER AND SERVANT—DUTY AS TO APPLIANCES—ELECTRIC WIRES.— Electrical companies, in the maintenance of their wires, owe to their employees and others rightfully in vicinity of such wires the duty of exercising reasonable care, which varies with the circumstances of each case, and which in the case of wires carrying a dangerous current of electricity, requires the exercise of a high degree of care to keep them properly insulated and so suspended as not to endanger lives. (Page 333.)

2. SAME—NEGLIGENCE OF VICE PRINCIPAL.—A foreman under whom workmen are employed may be a fellow servant with the workmen when engaged in accomplishing with them the common task or object; but when discharging the duties toward the workmen which the law imposes on the principal he is a vice principal. (Page 333.)

3. SAME—NOTICE TO VICE PRINCIPAL.—Notice to a vice principal of a defective appliance is notice to the master. (Page 334.)

4. SAME—EFFECT OF PROMISE TO MAKE REPAIRS.—Where a master has promised to repair a defective appliance, the servant does not assume the risk of injury caused thereby within such period of time after the promise as would be reasonably allowed for its performance, or within any period which would not preclude all reasonable expectation that the promise might be kept. (Page 335.)

5. SAME—ASSUMED RISK.—Where plaintiff, a telephone lineman, was injured by his employer's line becoming crossed with an electric light wire, which he had the evening before assisted in tying down, a request that the jury be charged that if plaintiff "passed the point where the wire had been tied down the evening before, and saw, *or could have seen,* that said wire was still tied down, and

that no permanent change had been made, then he assumed the risk of said condition when he went to work at the point where he was injured" was properly modified by striking out the words italicized. (Page 335.)

6. DAMAGES—WHEN NOT EXCESSIVE.—A verdict for $6,600 for personal injuries is sustained by evidence that plaintiff lost an arm, had both feet permanently deformed and swollen, and experienced very great pain and suffering. (Page 336.)

7. JOINT TORT—EFFECT OF RELEASE OF ONE TORTFEASOR.—A covenant not to sue one of two joint tortfeasors does not operate as a release of the other from liability. (Page 336.)

Appeal from Miller Circuit Court; *Jacob M. Carter,* Judge; affirmed.

### STATEMENT BY THE COURT.

This is a suit brought by Henry Pemberton to recover for personal injuries caused by reason of the negligence of the Texarkana Telephone Company in failing to repair certain dangerous wires within a reasonable time, as Pemberton was led to believe would be done.

About dark on the 19th day of November, 1906, the plaintiff and John Few, "trouble shooters" for the Texarkana Telephone Company, were sitting in the office of Roy Taylor, the wire chief of the company, after their day's work was done. Mrs. De Grazier called up the wire chief from her residence on Beech Street, and reported that there was a wire down in the street beyond her residence, crossed with an electric light wire. Burton, the line order foreman, had gone home, and, owing to the great damage that might result from a telephone wire being down in the street charged with 2,300 volts of electric light current, the wire chief asked the trouble shooters to go out and fix the wire temporarily, so that it would not be dangerous until it could be permanently repaired. Pemberton and Few went out to locate the trouble, and found that one of the wires of the Texarkana Telephone Company had "slacked" up against the electric light wire, and the electric light current was passing from its wire to the telephone wire, producing a bright light at the point of contact. Owing to the great danger of trying to cut down in the dark the telephone wire charged with this heavy current, they telephoned the wire chief the condition of the wire, and told him to bring a rope with which to temporarily tie down the wire.

The wire chief immediately carried them a rope. This was thrown over the wire and tied to a nearby fence until it could be fixed the next morning.

The plaintiff adduced testimony tending to show that it was not the duty of the "trouble shooters" to make repairs in the wiring of the telephone system, as they carried only pliers and a screw driver to be used in adjusting telephone instruments or making minor repairs, while the line order foreman had a wagon ladder, rope, wire and all apparatus necessary to make changes in or to repair the wiring. That all defects, either in the wiring or in the telephone, were reported to the wire chief. That he made out tickets showing as near as could be the location where the repairs were needed, and these were delivered to the employees whose duty it was to do that particular work. That the trouble men would go to the place designated on the ticket and make the necessary repairs. Then the wire chief was called, and they would not leave the place until their work was O.K.d by him over the wire. That the next morning, after the wire was tied down as above stated, the wire chief had a great deal of testing to do, and that Pemberton and Few did not get their trouble tickets showing where they should go to work until 9 o'clock, and as soon as the wire chief delivered his tickets to him Pemberton went to his duties as designated by the tickets. That his duty required him to climb a pole to put up his receiver to call up the DeGrazier line, and his left arm got up against a charged wire. That the current went through his body. That he was so badly burned that one arm had to be amputated; and that his feet are permanently injured. That the accident occurred about 11 o'clock in the morning. That he was standing on the messenger wire which was grounded. That this was the customary way of doing that particular kind of work, and that he probably would not have been shocked if he had not been standing on it. The accident occurred by reason of the rope, which had been used to tie the telephone wire the evening before, having become slacked, so that the telephone wire again had come in contact with the electric light wire.

The defendant adduced testimony tending to show that Pemberton had passed the place where the wires were in con-

tact on the morning of the accident, but this he denies, and also said that he thought the lines had been fixed as it was the custom to repair them at once when the lines were crossed with the electric light wires on account of the extreme danger caused by the heavy current.

There was a verdict for the plaintiff in the sum of $7,000. The court on its own motion reduced the verdict and judgment to $6,600, and defendant has appealed.

*R. W. Rogers* and *Webber & Webber,* for appellant.

1. The wire chief was not a vice-principal, and no promise of his bound the company.

2. The plaintiff was guilty of contributory negligence, and can not recover. 1 Labatt on Master and Servant, § 332; 77 Tex. 44; 51 Ark. 476; 76 *Id.* 436, 10; 82 Ark. 334. The wire chief was a fellow servant. 58 Ark. 71; 58 *Id.* 213; 58 *Id.* 226. The burden was on plaintiff to show that a negligent servant is not his fellow-servant. 2 Labatt, Master & Servant, § 512; 63 Ark. 477. Who are fellow-servants is a question of law where the facts are undisputed. 2 Labatt, Master & Servant, pp. 1352-1424; 77 Ark. 290.

2. The wire chief was "a mere foreman." 77 Ark. 290; 82 Ark. 334; 63 Ark. 477.

3. A servant having an opportunity to know of a risk assumes it. 1 Labatt, Master & Servant, § 401; 47 N. E. 117; 41 Ark. 549; 58 *Id.* 125.

6. No evidence to support verdict, and it is excessive.

*W. H. Arnold* and *G. G. Pope,* for appellee.

1. The wire chief was a vice-principal, and not a fellow-servant. 82 N. E. 202; 67 Ark. 213; 67 Atl. 1014; 82 Ark. 499; 58 *Id.* 168; 82 *Id.* 334; 104 S. W. 535.

2. Doctrine or rule of assumed risk and contributory negligence does not apply, and is not shown in this case. 154 U. S. 190; 81 S. W. 487; 50 *Id.* 601; 95 *Id.* 277.

3. A verdict can not be directed for defendant except when the proof is insufficient to support a verdict after the plaintiff's testimony is given its strongest probative force in plaintiff's cause of action. 76 Ark. 520.

4. The evidence fully justifies the verdict.

*R. W. Rodgers* and *Webber & Webber,* on motion to re-
verse and dismiss.

Plaintiff's settlement with the other company releases
appellant from all liability. 3 Allen 474; 83 N. W. 1091; 83
Am. Dec. 154; 24 Am. Rep. 504; 93 N. W. 243; 58 L. R. A.
293; 17 Atl. 338; 15 Am. Dec. 534; 45 Ark. 290; 70 *Id.* 197; 1
Cyc. 329; 36 Am. Rep. 830; Cooley on Torts, 138; 73 Ark. 14.

*W. H. Arnold* and *G. G. Pope* in reply, on motion to dis-
miss.

No release has ever been executed, only a covenant not to
sue the gas company. 83 S. W. 258; *Ib.* 1098; 70 Ark. 197;
45 *Id.* 290.

HART, J., (after stating the facts.) The defendant bases
its objection to the first instruction given by the court, and to
the refusal of the court to give the instructions asked by it, upon
the ground that the record discloses no evidence to sustain the
position assumed by plaintiff that the wire chief stood in the
relation of vice-principal to the defendant. "Electrical compan-
ies, in the maintenance of their wires, owe to their employees,
as well as to others who may of right, either for pleasure or
work, be in the vicinity of such wires, the duty of exercising
reasonable care, that is, such care as a reasonably prudent man
would exercise under the same circumstances. We have already
stated that reasonable care or ordinary care is a degree of care
varying with the circumstances of each case, and which, in the
case of electrical wires carrying a dangerous current of elec-
tricity, requires the exercise of a high degree of care to keep
them properly insulated and so suspended as not to endanger
lives. And this is the measure of an electrical company's duty
to its employees. And it owes the duty not only of properly
insulating its wires, but also of exercising reasonable care in
their suspension, to prevent contact with other wires. 2 Joyce
on Electric Law, § 663.

Corporations can only act through their agents. Therefore
it devolved upon the company to have some one to perform its
duties to its employees. Its system of conducting its business
required all defects, either in the wires or the telephones, to be
reported to the wire chief. All the troubles arising from the

telephone service were reported to him. His duty was to make tickets of these troubles and give them to the respective employees whose duty it was to make the necessary repairs. He was the directing agent, and the line foreman and the trouble men were under him. It was part of the system of work that they should only make repairs under the direction of the wire chief.

There must be some one acting for the master, else the business would soon be involved in hopeless confusion. The employees would work at cross purposes, and might daily be subjected to the hidden but very dangerous force of heavy electrical currents. In the present case it can not be denied that it was the duty of the master to use reasonable diligence in repairing the dangerous contact between the telephone and electric wires, and that the injury resulted because the repairs were not made.

It is evident from the testimony as shown in the record that the rules and regulations of the company required that the trouble men should work under the directions of the wire chief. We are of the opinion that this made him a vice-principal.

"It has been decided that a foreman under whom workmen are employed is a fellow servant with the workmen, when engaged in accomplishing with them the common task or object; but when discharging or assuming to discharge the duties towards the workmen which the law imposes on the principal he is a vice-principal." 2 Joyce on Electric Law, § 655.

The doctrine was recognized by this court in the case of *Western Coal & Mining Company* v. *Buchanan,* 82 Ark. 502, in which the court said: "The duty of inspecting a mine for gas is always a principal's duty, and its delegation to a servant does not make that servant a fellow servant of his co-workers; but he becomes, while in the performance of such duties of inspection, a vice-principal."

Notice to the wire chief (he being a vice-principal) of the dangerous condition of the wires was notice to the company. The line foreman whose duty it was to fix the wire left the office of the company on the morning of the accident before Pemberton left. The undisputed evidence shows that it would take the line foreman only a few minutes to cut the wire and relieve the contact. Whether or not Pemberton had reasonable grounds to

believe that the repairs would be made before the time of the accident was a question for the jury.

The following from Shearman & Redfield on Negligence is quoted as the correct rule in the case of *Western Coal & Mining Company* v. *Burns*, 84 Ark. 79: "Where a master has promised to repair a defective appliance, the employee does not assume the risk of injury caused thereby, within such a period of time after the promise as would be reasonably allowed for its performance, or within any period which would not preclude all reasonable expectation that the promise might be kept."

In the case of *Archer-Foster Construction Company* v. *Vaughn,* 79 Ark. 20, it was held that a master is liable for the negligence of a vice-principal in failing to provide a servant a safe place to work, though such vice-principal was also guilty of concurring negligence as a fellow servant.

. It is also contended that Pemberton was guilty of contributory negligence because he stood on the messenger wire which was grounded, but the uncontradicted evidence shows that this was the custom, and there was no danger in standing on it if it had not been for the contact with the electric light wire.

Appellant asked the court to give the following instruction:

"No. 8. You are instructed that if you believe from the evidence in this case that the plaintiff on the morning of his injury passed the point where the wire had been tied down the evening before, and saw, or could have seen, that said wire was still tied down, and that no permanent change had been made, then he assumed the risk of said condition when he went to work at the point where he was injured, and your verdict should be for the defendant."

The court gave it with the words "or could have seen" eliminated. It is now claimed that the court erred in not giving the instruction as asked by appellant, but this would have been practically telling the jury that it was the duty of appellee to have examined the condition of the rope and wire the next morning, regardless of whether a prudent person would have done so.

The other instructions asked by the appellant, and upon which its counsel predicates error, were on the fellow servant doctrine, which has already been discussed.

The amount of the verdict is sustained by the evidence. Plaintiff lost his arm. Both feet are deformed and swollen, and the jury had sufficient testimony upon which to find that the injury to his feet was permanent. Besides, his pain and suffering must have been very great.

Appellant filed a motion to reverse and dismiss this case, and for grounds states that, since the trial in the lower court and during the pendency of this appeal, plaintiff has compromised his claim against the Texarkana Gas & Electric Company, and executed to it a release or a covenant not to sue for the sum of $500. To this motion plaintiff filed a response in which he denied that he had released said company from liability, but admitted that he did enter into an agreement with it not to institute any suit against it on account of the injury which is the basis of this suit. He exhibits the agreement with his response. An examination of it shows that it is a covenant not to sue. Conceding but not deciding that the question may be raised for the first time in this court, we are of the opinion that the motion should not be granted for the reasons here given. In the cases of *Hadley* v. *Bryan*, 70 Ark. 197, and of *Pettigrew Machine Co.* v. *Harmon*, 45 Ark. 290, it was held that a covenant not to sue does not amount to a release. These were cases arising out of suits on contracts, but the same distinction is applied to joint tortfeasors. A covenant not to sue one of two joint tortfeasors does not operate as a release of the other from liability. 1 Jaggard on Torts, p. 345.

Affirmed.